# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MISSOURI
# EASTERN DIVISION

| | |
|---|---|
| ROSEMARIE E. WADDY, ) | |
| ) | |
| Plaintiff, ) | |
| v. ) | Case No. 4:22-cv-00002-SEP |
| ) | |
| HIGHLAND VENTURES AND KEITH ) | |
| HOODGLAND LIMITED PARTNERSHIP, ) | |
| ) | |
| Defendants. ) | |

## MEMORANDUM AND ORDER

Before the Court are Defendants' Motion for Judgment as a Matter of Law, Doc. [83], and Motion for New Trial or Remittitur, Doc. [84]. The motions are fully briefed, and ready for disposition. *See* Docs. [90], [94], [95]. For the reasons set forth below, both motions are denied.

### BACKGROUND

Plaintiff Rosemarie E. Waddy filed a complaint against Defendants Highland Ventures and Keith Hoodgland Limited Partnership after she was injured crossing a parking lot on Defendants' property. *See* Doc. [21]. After a three-day trial, the jury returned a verdict in favor of Plaintiff. *See* Doc. [76].

At trial, Plaintiff testified that on January 19, 2019, she was walking her dog across the parking lot connected to Family Video and Marco's Pizza. Doc. [80] at 24, 34. Plaintiff decided to cut across the parking lot because it appeared safer to walk on than the sidewalk that had been impacted with snowplow snow. *Id*. at 34. Because the parking lot was covered in snow, Plaintiff could not see the pavement underneath. *Id*. Plaintiff noticed some cones in the parking lot, so she continued on a path approximately 10 feet to the right of the cones. *Id*. at 34-35. While walking, Plaintiff's right foot became stuck. *Id*. at 36-37. When she tried to take a step with her left foot, she could not lift her right heel, causing her to slip and fall "violently." *Id*. at 36. When she looked down after her fall, Plaintiff noticed her foot was "dangling" and she "couldn't do anything with it." *Id*. at 37. Plaintiff testified that the "pain was unimaginable, horrific." *Id*. at 38. Several days later, on January 22, 2019, Plaintiff went back to the parking lot with her husband "to see exactly where [she fell] and what was there." *Id*. at 42. It was at that time that Plaintiff realized her foot had been stuck in a hole in the parking lot. *Id*. at 42-45.

1

Plaintiff admitted on cross-examination that she had seen the specific hole in the parking lot before January 20, 2019, and that she knew the holes in the parking lot were dangerous. *Id*. at 100-02. But she went on to explain that the pavement was covered in snow and that she had not memorized the location of the specific holes. *Id*. at 101, 146. Plaintiff was also challenged on her testimony that she sustained her injury by stepping in the hole. Defendants submitted the case notes of several different doctors who all noted that Plaintiff had told them that she slipped and fell on the ice. *See* Exhs. [BO] at 17 ("presents with right ankle deformity and pain after slipping on the ice today"); [DF] at 1 ("Rosemarie was walking her dog when she slipped and fell on some ice fracturing her right ankle"); [DH] at 1 ("She broke her left ankle 1.5 months ago when she fell on ice while walking her dog."); [DI] at 1 ("Back on 01/28/2019 Rosemarie was walking her dog when she slipped and fell on ice fracturing her right ankle."); [DN] at 1 ("Back on [sic] January 2018, Rosemarie slipped and fell on ice while walking her dog fracturing her right ankle."). Defendants also introduced a note by Plaintiff's physical therapist that stated, "Veteran reports tripping over her dog in January 2019 at which point she fractured her R ankle." Exh. [DC] at 178. Plaintiff testified that the notes did not reflect what she told the providers: that she injured herself when her foot got stuck in the hole causing her to slip on the ice. *See* Doc. [80] at 119-36.

Plaintiff next called Dr. Miller, the doctor who performed Plaintiff's surgeries, to testify about Plaintiff's injury and the three different surgeries performed on Plaintiff's foot. Dr. Miller described in great detail the extent of Plaintiff's injury. *See* Doc. [78] at 11-14; *see, e.g.*, *id*. at 11 ("[Plaintiff's foot] went towards the fibula when she injured it. And that pulled the medial malloelus off and broke the fibula as it went over. So the talus moved out of its normal location and broke those pieces as it went."). She also described in great detail the intricacies of the first surgery performed on Plaintiff's foot. *Id*. at 15-16; *see, e.g.*, *id*. at 15 ("The procedure [was] to fix the medial and the lateral malloelus . . . with metal, so, in our case, plates and screws. And to fix the syndesmosis disruption, which is the ligaments . . . that were disrupted. And then to leave the posterior malloelus to heal on its own without surgery.").

Following the first surgery, Plaintiff was non-weightbearing for eight weeks. Doc. [80] at 46. Plaintiff testified that she was in "the worst pain ever," and that her physical therapy sessions were "so painful," "like somebody had tore apart [her] ankle, extreme pain, extreme achiness, nerve sensations, throbbing, burning, aching." *Id*. at 47. Plaintiff explained that she

2

"kept begging" Dr. Miller to take out the hardware (plates and screws) from her ankle because it "seemed to be aggravating [her] ankle." *Id*. at 47-48.  Six months later she went to the ER because she was in so much pain.  *Id*. at 48.  She again asked to have the hardware taken out, but Dr. Miller told her that she needed to wait another six months to remove it.  *Id*.  Dr. Miller testified that she generally tells patient to wait a year to have their hardware removed because "some studies [ ] show that there's a slightly higher risk of re-breaking the bone if the hardware is removed sooner in certain bones."  Doc. [78] at 18.  During this six-month waiting period, Plaintiff arranged for ankle injections.  *Id*.; *see also* Doc. [80] at 52.  Dr. Miller explained that injections help control the pain, but also help determine where the pain is coming from.  Doc. [78] at 18.  Plaintiff ended up having surgery to remove the hardware in January 2020.  *Id*. at 19.

A couple weeks after the second surgery, Plaintiff "came back [to Dr. Miller] with a new concern about her wound."  *Id*.  According to Dr. Miller, the wound appeared to be infected and the best way to take care of the infection would be to "clean it out in the operating room."  *Id*.  Plaintiff testified that she became distressed after Dr. Miller told her the infection had reached the bone and that she might need a foot amputation.  Doc. [80] at 53, 60-61.  To remove the infection, Dr. Miller testified that they "scrape out any bone that doesn't look like it's viable or has an infection," and then "clean it with special tools that are used for scraping and removing bone."  Doc. [78] at 20.

Plaintiff testified that she continues to have pain in her ankle.  Doc. [80] at 61-65.  She uses a tactile machine on a "close-to-nightly basis" to help with pain and swelling and circulation, and she does "a lot of natural-type remedies," physical therapy, and ice compression.  *Id*. at 62-65.  Plaintiff also testified extensively about the impact her injury has had on her ability to participate in social activities with her friends and family.  *See id*. at 68-82.  Cliff Waddy, Plaintiff's husband, also testified about the ways his wife's life has changed since her injury.

During cross-examination, Defendants challenged Plaintiff on her alleged pain and suffering.  Specifically, defense counsel asked several questions attempting to get Plaintiff to admit that Dr. Miller had never told Plaintiff that she should limit or restrict her activities.  *See, e.g.*, *id*. at 151 (Q. "She didn't tell you that you couldn't enjoy all the activities that you talked about with your husband and grandchildren; she didn't tell you [ ] couldn't do those things, did she?"  A. "I'm not sure.").  Defense counsel also asked Dr. Miller whether she placed any restrictions or limitations on Plaintiff.  Doc. [78] at 2-3.  Dr. Miller responded that she did not

3

restrict Plaintiff from doing anything, but she did not know whether Plaintiff would be able to perform all the activities. *Id*. at 3. Dr. Miller also confirmed that Plaintiff had not contacted her or her office "since September of 2022 for treatment or scheduling additional visits or anything like that." *Id*. at 6.

Plaintiff also called Defendants' Corporate Representative, a Highland Ventures employee of 28 years who was the Regional Vice President of Family Video at the time and location of Plaintiff's injury. Doc. [88] at 4-5. The Corporate Representative testified that Defendant Keith Hoogland Limited Partnership technically owned the property where Plaintiff injured herself, but Defendant Highland Ventures was responsible for operating and maintaining the property. *Id*. at 7-8. He confirmed that Highland Ventures expects that non-patrons will walk on the pavement and on the property. *Id*. at 15. The Corporate Representative further confirmed that Highland Ventures understood that "as a corner property with no fencing or barricades up, that people might just be walking across it sometimes," *id*. at 16, and that "it was important to maintain [the property] in good condition at all times because at any point in time anyone could be walking on it." *Id*. at 17. But instead of hiring "companies that are specifically trained[] [and] designed . . . to manage commercial properties," the Corporate Representative confirmed that Highland Ventures maintained the property by means of Family Video store policies that were supposed to be followed by store employees who were not "necessarily trained in commercial property management." *Id*. at 25-26, 29.

Plaintiff's counsel then walked the Corporate Representative through several of the store's policies. First, counsel pointed to the policy that employees should, on a daily basis, "[s]pend as much time as it takes to clean the parking lot, bushes, trash, cigarettes, etc." Exh. [1] at 5. The Corporate Representative confirmed that there is also a policy to keep the "parking lot pavement [ ] in good condition," so that when employees go out on a daily basis to clean up the parking lot, they are also expected to look for any unsafe conditions. Doc. [88] at 18-19. Counsel also pointed to the store policy that instructs managers to evaluate the parking lot biannually for things that need repair. Exh. [1] at 6 ("Evaluate the parking lot. Does it need striping or seal coating? Are there any potholes that need to be repaired? Call your Regional Manager to get it scheduled."). Finally, Plaintiff's counsel directed the Corporate Representative to the store's Winter Maintenance policy, which required managers to contract with a company

4

to have the parking lot plowed after a snowfall, but that the lot should be plowed only if three or more inches of snow had fallen.  Exh. [1] at 7.

Counsel then asked the Corporate Representative a series of questions about the area where Plaintiff alleged to have fallen.  The Corporate Representative described the area—a hole where four lines intersect—as having been "cross-cut."  Doc. [88] at 49.  He explained: "Typically it's when they've laid concrete, they cut joints that can expand or contract with the weather so that, you know, the concrete doesn't come together and crack."  *Id*. at 50.  The Corporate Representative confirmed that cross-cutting "create[s] certain potentially vulnerable points of the concrete in a sense that water can get in those seams."  *Id*.  And if water gets in those seams over time, it can degrade the condition of the pavement.  *Id*.  The examination continued:

> Q. Okay.  That this concrete where it's cross-cut has degraded over a long period of time; right?
>
> A. I don't know how long of a period of time, but –
>
> Q. Months, at least, probably years; right?
>
> A. Could be.
>
> Q. Fair to say, that's what you've said before; right?  Fair to say?
>
> A. Yes.
>
> Q. Meaning over this period of time that this pavement is degrading, all of that time if someone is following the policies of Family Video, theoretically they would be able to see it if they're going out onto the parking lot looking for these things; right?
>
> A. They could see -- they could see what?
>
> Q. They could see pavement degrading over time?
>
> A. Yes.
>
> Q. Okay. And if it gets to a condition where it becomes unsafe, they're supposed to do something about it?
>
> A. Correct.
>
> Q. So in that sense, Highland Ventures has, however long it takes for this to happen, weeks or months or maybe even years to observe a condition that's getting like this; right?
>
> A. Correct.
>
> Q. And to do something about it?
>
> A. Correct.

5

> Q. And they have employees that are specifically told to go out and walk on a daily basis to see the condition of this concrete, and that's what they're assigned to do; right?
>
> A. Yes.
>
> Q. And they're doing it on days where there's nothing covering the pavement; right?
>
> A. Correct.
>
> . . .
>
> Q. As we said, someone walking on the parking lot, if there's the 3 inches of snow that Highland Ventures has allowed to be there, they wouldn't see the pavement underneath the snow. That's what you said before; right?
>
> A. Correct.
>
> Q. . . . As between that situation that we just said, someone walking on the parking lot with the snow there where they wouldn't be able to see the condition underneath, versus Highland Ventures employees that are told to go out there on a daily basis, you would agree, sir, that Highland Ventures is in a better condition -- better position to see the condition of the parking lot; right?
>
> A. Yes.

*Id*. at 51-53.

At the conclusion of Plaintiff's case-in-chief, Defendants moved for judgment as a matter of law, arguing that Plaintiff's admission that she knew the hole was there and that the hole was dangerous negated a fundamental element—i.e., that Defendant knew or had information from which Defendant, in the exercise of ordinary care, should have known that persons such as Plaintiff would not discover such a condition or realize the risk of harm. *See* Doc. [80] at 189-94. Defendants relied on *Harris v. Niehaus*, 857 S.W.2d 222, 227 (Mo. 1993), in which the Missouri Supreme Court stated, "where the danger is open and obvious as a matter of law and the risk of harm exists only if the plaintiff fails to exercise due care, the case is not submissible to the jury . . . ." The Court denied Plaintiff's motion explaining:

> I think there is less certainty than you do, Mr. McChesney, about what Plaintiff knew, based on her testimony. I think she admitted -- my recollection is that she admitted knowing that there were holes in the parking lot and then answering that those holes could be dangerous. I don't think she came out and said, I knew there was a hole there and it was dangerous, and yet I went on the parking lot anyway. And I think the jury could reasonably interpret her testimony to be saying something closer to the former than the latter.
>
> In addition, the third element here is about what Defendant knew or had reason to know about persons like Plaintiff and the condition and whether or not they would discover it. That to me, while I agree that the fact that this plaintiff has admitted some knowledge of

6

> an issue with the parking lot and that she knew -- I mean, I don't want to put words in her mouth, but certainly a reasonable juror could interpret her testimony as suggesting that she had a sense that there might have been some risk walking onto that parking lot. How much risk, where, all of that I think is subject to interpretation.
>
> But even though she made admissions in that general, in that general area, which I think the jury could be justifiably a little confused about exactly what the nature of those admissions were, I don't think that affects -- I think that goes to, as Plaintiff has argued, whether or not she could be found to have some role in the negligence and not to what Defendant knew or should have known. And I think the plaintiff's case as to Defendant's knowledge, which is really about what the corporate representative testified, is sufficient to send to a jury.

*Id.* at 219-20.

Defendants did not call any witnesses, and the case was submitted to the jury. The jury assessed 85 percent of the fault to Defendant Highland Ventures and 15 percent of the fault to Plaintiff and found that Plaintiff's damages, disregarding any fault on the part of the Plaintiff, were $2,000,000.00. *See* Doc. [75]. Defendants now move for judgment as a matter of law, or in the alternative, a new trial or remittitur.

## LEGAL STANDARD

Rule 50 of the Federal Rules of Civil Procedure states that, when ruling on a renewed motion for judgment as a matter of law, "the court may: (1) allow judgment on the verdict, if the jury returned a verdict; (2) order a new trial; or (3) direct the entry of judgment as a matter of law." Fed. R. Civ. P. 50(a)-(b). The Eighth Circuit has stated that "[j]udgment as a matter of law is appropriate only when the record contains 'no proof beyond speculation to support the verdict.'" *Am. Bank of St. Paul v. TD Bank, N.A.*, 713 F.3d 455, 462 (8th Cir. 2013) (quoting *Wilson v. Brinker Int'l, Inc.*, 382 F.3d 765, 770 (8th Cir. 2004)) (additional citations omitted). Put differently, judgment as a matter of law "is appropriate 'when all the evidence points one way and is susceptible of no reasonable inferences sustaining the position of the non-moving party.'" *Hortica–Florists' Mut. Ins. Co. v. Pittman Nursery Corp.*, 729 F.3d 846, 854 (8th Cir. 2013) (quoting *Ehrhardt v. Penn Mut. Life Ins. Co.*, 21 F.3d 266, 269 (8th Cir. 1994)). A court ruling on a renewed motion for a judgment as a matter of law must:

> (1) resolve direct factual conflicts in favor of the nonmovant, (2) assume as true all facts supporting the nonmovant which the evidence tended to prove, (3) give the nonmovant the benefit of all reasonable inferences, and (4) deny the motion if the evidence so viewed would allow reasonable jurors to differ as to the conclusions that could be drawn.

7

*Stults v. Am. Pop Corn Co.*, 815 F.3d 409, 418 (8th Cir. 2016) (quoting *Jones v. Edwards*, 770 F.2d 739, 740 (8th Cir. 1985)). And in doing so, a court must "not make credibility determinations or weigh the evidence." *Meyers v. Starke*, 420 F.3d 738, 741 (8th Cir. 2005) (quoting *Kipp v. Mo. Highway & Transp. Comm'n*, 280 F.3d 893, 896 (8th Cir. 2022)).

Federal Rule of Civil Procedure 59(a)(1)(A) states that a court may grant a motion for a new trial after a jury trial "for any reason for which a new trial has heretofore been granted in an action at law in federal court." A new trial is appropriate if there is a "clear showing that the outcome is 'against the great weight of the evidence so as to constitute a miscarriage of justice.'" *Weitz Co. v. MH Wash.*, 631 F.3d 510, 520 (8th Cir. 2011) (quoting *Foster v. Time Warner Entm't Co.*, 250 F.3d 1189, 1197 (8th Cir. 2001)). When considering whether the outcome is against the great weight of evidence, "[a] district court need not view the evidence in the light most favorable to the verdict; it may weigh the evidence and in doing so evaluate for itself the credibility of the witnesses." *United States v. Lincoln*, 630 F.2d 1313, 1319 (8th Cir. 1980). "A new trial is [also] appropriate when the first trial, through . . . an excessive damage award[ ] or legal errors at trial, resulted in a miscarriage of justice." *Gray v. Bicknell*, 86 F.3d 1472, 1480 (8th Cir. 1996). Not every error requires granting a new trial; the "key question is whether a new trial should have been granted to avoid a miscarriage of justice." *Bass v. Gen. Motors Corp.*, 150 F.3d 842, 845 (8th Cir. 1998).

In reviewing Rule 59 motions, unlike Rule 50 motions, "the trial court can rely on its own reading of the evidence—it can 'weigh the evidence, disbelieve witnesses, and grant a new trial even where there is substantial evidence to sustain a verdict.'" *Waitek v. Dalkon Shield Claimants Tr.*, 934 F. Supp. 1068, 1092 (N.D. Iowa 1996) (quoting *White v. Pence*, 961 F.2d 776, 780 (8th Cir. 1992)). "The authority to grant a new trial is confided almost entirely to the exercise of discretion on the part of the trial court." *Champeau v. Fruehauf Corp.*, 814 F.2d 1271, 1274 (8th Cir. 1987) (cleaned up). But the court "may not usurp the role of the jury by granting a new trial simply because it believes other inferences and conclusions are more reasonable" than those drawn by the jury. *Rustenhaven v. Am. Airlines*, 320 F.3d 802, 805 (8th Cir. 2003).

## DISCUSSION

**I.     Defendants are not entitled to judgment as a matter of law.**

Defendants submit that they are entitled to judgment as a matter of law because the hole in the parking lot ("the Condition") was open and obvious as a matter law.  As they did on their first motion for judgment as a matter of law, Defendants rely on *Harris*, 857 S.W.2d at 226, in which the Supreme Court of Missouri adopted the Restatement (Second) of Torts §§ 373 and 343A(1) and held that "a possessor's actions do not fall below the applicable standard of care if the possessor fails to protect invitees against conditions that are open and obvious as a matter of law."  The plaintiff in *Harris* tried to argue that the court's decision in *Cox v. J.C. Penney Co.*, 741 S.W.2d 28 (Mo. 1987) (en banc), "removed the issue of the plaintiff's knowledge of an obviously dangerous condition as a[n] element of the plaintiff's cause of action." *Harris*, 857 S.W.2d at 227.  In *Cox*, the court held that the district court erred when it instructed the jury to find as a second element that "plaintiff did not know and by using ordinary care could not have known of this condition."  741 S.W.2d at 29-30.  The court "reasoned that the adoption of comparative fault placed in juries the requirement to assess the relative fault of the parties in tort actions and concluded that the second element of [the jury instruction] 'pretermits jury assessment of respondent's fault for failure to maintain the premises in a reasonably safe condition.'"  *Harris*, 857 S.W.2d at 227 (quoting *Cox*, 741 S.W.2d at 30).  The court in *Harris* explained that "[a] more crisp analysis in *Cox* would have pointed out that the second element of the instruction—that 'plaintiff did not know and by the exercise of ordinary care could not have known of this condition'—hopelessly intermingles questions about the condition of the property with the plaintiff's responsibility to keep a careful lookout." *Id*.  The *Harris* court went on to conclude that "*Cox* did not intend to abrogate the open and obviousness of a condition as a consideration for the court in determining a possessor of land's standard of care.  Quite simply, where the danger is open and obvious as a matter of law and the risk of harm exists only if the plaintiff fails to exercise due care, the case is not submissible to the jury—and the dilemma resolved in *Cox* is never reached." *Id*.

Defendants claim that the Condition was open and obvious as a matter of law and as such, the case should never have been submitted to the jury.  Defendants point to several pieces of Plaintiff's testimony to establish that the Condition was open and obvious.

9

> Q. And with specific regard to the hole that you claim to be the cause of your injury in this case, would it be true to say that you had seen that hole before January 20 of the year 2019?
> A. Yes
>
> . . .
>
> Q. But in any event, you knew before January 20 of the year 2019 that this specific hole was there and other holes on the lot; correct?
> A. Correct, but I didn't memorize them.
>
> . . .
>
> Q. Yeah. You've indicated that you had previously seen this specific hole at issue in this case before January 20, 2019. You've also indicated that you, based upon your personal observations, knew that the holes in the parking lot were dangerous before January 20, 2019.  Now I'm just asking the same question with regard to this specific hole.  Would it be true to say that since you had seen that hole before January 20, 2019, you knew that that hole specifically was dangerous?
> A. Correct
>
> . . .
>
> Q. And when you chose to walk across that parking lot -- and let's just assume, just for the sake of this question, I'm not agreeing that this is how you fell; as you can tell, I probably have other -- when you started to walk across that parking lot, you knew that underneath that ice and snow there were dangerous holes; correct?
> A. I did not know their location.
>
> Q. Exactly.  That's my point.  You knew that under the holes -- under the snow on that parking lot that at locations that were not clear to you, there were holes that were dangerous if you stepped in them; correct?
> A. Correct.

Doc. [80] at 100-02, 143.

The Court stands by its initial determination that Plaintiff's testimony did not establish that the Condition was open and obvious as a matter of law.  "Comment b of the Restatement, Section 343A(1) defines 'obvious' as when 'both the condition and the risk are apparent to and would be recognized by a reasonable man . . . exercising ordinary perception, intelligence, and judgment.'" *Smith v. The Callaway Bank*, 359 S.W.2d 545, 547 (Mo. Ct. App. 2012).  As noted by the Missouri Court of Appeals, cases in which courts have found that a condition was open and obvious "involved a natural or regular condition of land and/or a large physical structure. [*See, e.g.,*] *Harris*, 857 S.W.2d at 226-27 (road sloped down towards a lake was a 'natural condition . . . open and obvious to all who would encounter it[ ]'); *Hokanson v. Joplin Rendering Co., Inc.*, 509 S.W.2d 107, 111 (Mo. 1974) (the regular presence of a greasy floor in a plant with large vats of fatty grease was a 'known or obvious' danger); *Crow v. Kansas City Power & Light*

10

*Co.*, 174 S.W.3d 523, 538 (Mo. [Ct.] App. 2005) ([o]verhead electrical power lines were open and obvious); *Hopkins v. Sefton Fibre Can Co.*, 390 S.W.2d 907, 912 (Mo. [Ct.] App. 1965) (six-feet long dark brown dividers on light gray asphalt parking lot were an open and obvious condition)." *Id*. at 548.  Such cases are readily distinguishable from the case at bar.  Viewed in the light most favorable to the verdict, the evidence established that the snow made it impossible to see where the holes in the parking lot were located.  Based on that evidence, the Court cannot conclude, as a matter of law, that the hole was "a dangerous condition so open and obvious that [Plaintiff] could be reasonably expected to discover it."  *Callaway Bank*, 359 S.W.2d at 549; *see Eide v. Midstate Oil Co.*, 895 S.W.2d 35, 38 (Mo. Ct. App. 1995) (section of wooden fence was not open and obvious even though plaintiff admitted that she helped a manager move the fence section two months prior and admitted that she had previously mowed around the same section and "probably did" see the fence earlier on the day of the incident);  *Brown v. Morgan Cnty.*, 212 S.W.3d 200, 204-05 (Mo. Ct. App. 2007) (staircase "somewhere between 2 to 3 degrees out of horizontal" was not open and obvious even though plaintiff had used the stairs "approximately 100 times before her fall"); *Privitera v. Coastal Mart, Inc.*, 908 S.W.2d 779, 781-82 (Mo. Ct. App. 1995) ("Even if one could say that the pop outs [in the parking lot] were so open and obvious that a reasonable person should have been expected to discover the condition and realize the danger as a matter of law, which we are expressly unwilling to say, the surface was so riddled with holes that [defendant] should have anticipated the harm and corrected the condition.").

Because the Condition was not open and obvious as a matter of law, the case was properly submitted to the jury and the jury was reasonable for assessing the relative fault of each party.  *See Cox*, 741 S.W.2d at 30 ("Under comparative fault, we leave to juries the responsibility to assess the relative fault of the parties in tort actions.").  To that end, the Court instructed the jury that they must assess a percentage of fault to Plaintiff, whether or not Defendant was partly at fault, if they believed:

> First, Plaintiff knew that there were holes in the surface of the parking lot pavement of Defendant's property and as a result the parking lot was not reasonably safe, and
>
> Second, Plaintiff entered the parking lot and was thereby negligent, and
>
> Third, such negligence directly caused or directly contributed to cause any damage Plaintiff may have sustained.

11

Doc. [74] at 7. The jury then carefully evaluated the evidence and assessed 15 percent of the fault to Plaintiff, presumably due to Plaintiff's knowledge of the holes in the parking lot. Because the Condition was not open and obvious as a matter of law, and the jury was properly instructed on the issue of comparative fault, Defendants' motion for judgment as a matter of law is denied.[1]

## II. Defendants are not entitled to a new trial or remittitur on the basis that the Court erred in overruling Defendants' hearsay objection.[2]

Defendants also move for a new trial or remittitur on the basis that the Court erred in overruling Defendants' hearsay objection. On direct examination, Plaintiff's attorney asked Plaintiff about a conversation she had with Dr. Miller. Doc. [80] at 53. Before Plaintiff answered, Defendants' attorney objected to her anticipated testimony as inadmissible hearsay.

---

[1] While Defendants' argument for judgment as a matter of law focuses on the "open and obvious" doctrine, they also mention that Plaintiff "assumed the risk when she decided to walk across the parking lot anyway." Doc. [83] at 13. If Defendants take themselves to be arguing that assumption of risk is another basis on which they are entitled to judgment as a matter of law, that argument is unavailing for several reasons. First, they fail to provide any argument or authority for it. *See Milligan v. City of Red Oak*, 230 F.3d 355, 360 (8th Cir. 2000) (issue waived where it was "mention[ed] in passing" with no "argument or legal authority"). Second, Defendants did not take the opportunity at trial to ask the Court for an assumption of risk jury instruction. *Compare* Doc. [80] at 248-51 (the Court directing the parties to submit alternative versions of the assumption of risk jury instruction), *with* Doc. [74] (final jury instructions to which no party objected). And third, the evidence at trial did not establish that Plaintiff fully appreciated the degree and extent of the Condition. *See Gamble v. Bost*, 901 S.W.2d 182, 189 (Mo. Ct. App. 1995) ("The principle of assumption of risk is that the defendant cannot be liable for a danger to which plaintiff voluntarily exposed himself or herself, fully appreciating the degree and extent of the danger. If, on the other hand, a plaintiff has unreasonably failed to appreciate the danger, or is unreasonably careless in evaluating the need to proceed in spite of the danger, such a plaintiff has not voluntarily and consciously assumed the risk of being injured by a danger which is fully appreciated."); Doc. [80] at 146 ("How was I to know exactly where the holes were? The snow and the ice covered everything. I had no idea. I was trying to safely and quickly get home with my dog. I never anticipated stepping in a hole and having it be life-changing for me . . . . I walked very carefully. If I seen any kind of dips or anything like that, I avoided that area. If I could see any hazards, I avoided it.").

Defendants also mention—again without authority or argument—that "Defendant [does not] have a duty to clear snow or otherwise maintain its parking lot for Plaintiff, a gratuitous licensee, who was injured while cutting across Defendant's parking lot for personal reasons." Doc. [83] at 14. By failing to develop that argument, Defendants have waived it. *See Milligan*, 230 F.3d at 360.

[2] Defendants' motion for a new trial or remittitur focuses on the Court's overruling of Defendants' hearsay objection. *See* Doc. [84]. It provides no legal authority or argument that the jury's award was excessive. *See Bayes v. Biomet, Inc.*, 2021 WL 3286594, at *6 (E.D. Mo. Aug. 2, 2021) (outlining the numerous factors a court should consider when deciding whether an award is excessive). Plaintiff noted that deficiency in her opposition, *see* Doc. [90] at 8, to which Defendants chose not to reply. Defendants have thus waived any argument that the jury's award was excessive. *See Milligan*, 230 F.3d at 360; *see also supra* note 1.

12

*Id*. at 54.  The Court heard arguments at the bench and overruled Defendants' objection.  *Id*. at 54-60.  The Court found that the statement was not being offered for the truth of the matter but for the effect it had on Plaintiff.  *Id*.  The Court instructed Plaintiff's attorney to ask the question in terms of how it affected Plaintiff and not in terms of what exactly the doctor said.  *Id*. at 60.  Plaintiff's attorney rephrased the question asking, "Specifically what caused you concern about that conversation with Dr. Miller?"  *Id*. at 61.  Plaintiff answered: "[T]he infection was very concerning to me, and had the infection reached the bone, I would have required a foot amputation."  *Id*.  In closing statements, Plaintiff's attorney stated, "You heard Dr. Miller talk about what she had to do in that last one, the debridement, where she had to go in with a tool and scrape out the infected bone with an ice cream scoop that had edges on it because Mrs. Waddy was this close to needing an amputation of her foot."[3]  Doc. [81] at 18.  As Defendants correctly note, Dr. Miller did not mention anything about amputation in her testimony.

Defendants assert that the Court's "erroneous admission of hearsay evidence" was "highly prejudicial, as evidenced by the jury's verdict."  Doc. [84] at 10.  They note that "Dr. Miller testified that she did not impose any physical restrictions or limitations on Plaintiff's activities; Plaintiff presented no medical bills, lost wages, or economic damages; and yet the jury returned a verdict for Plaintiff in the amount of [$2,000,000]."  *Id*.

Because the statement was offered to show its effect on Plaintiff, the Court finds that it was not error to overrule Defendants' hearsay objection.  *See United States v. Wright*, 739 F.3d 1160 (8th Cir. 2014) ("A statement offered to show its effect on the listener is not hearsay." (cleaned up)).  On the other hand, counsel's statement during closing argument that "Mrs. Waddy was this close to needing an amputation of her foot" was improper, as the Court had very clearly admitted Ms. Waddy's testimony about her conversation with Dr. Miller only as evidence of Ms. Waddy's distress, not as evidence that she was, in fact, at risk of a foot amputation.

"When a new trial motion is based on improper closing arguments, 'a new trial should be granted only if the statements are plainly unwarranted and clearly injurious and cause prejudice to the opposing party and unfairly influence a jury's verdict.'"  *Lawrey v. Good Samaritan Hosp*., 751 F.3d 947, 954 (8th Cir. 2014) (quoting *Harrison v. Purdy Bros. Trucking Co.*, 312

---

[3] Defendants note that "Plaintiff's attorney held up his hand, using his thumb and index finger to emphasize to the jury that Plaintiff 'was this close' to needing an amputation of her foot."  Doc. [84] at 10 n. 4.

13

F.3d 346, 351 (8th Cir. 2002)).  It will be a "rare case[ ]" when this court finds that a party has "made a sufficient showing of prejudice caused by 'plainly unwarranted and clearly injurious' closing argument." *Gilster v. Primebank*, 747 F.3d 1007, 1008 (8th Cir. 2014) (quoting *Morrissey v. Welsh Co.*, 821 F.2d 1294, 1303 (8th Cir. 1987)).  "When deciding whether to grant a new trial due to improper remarks by counsel, [the Court] consider[s] whether: (1) the remarks in question were minor aberrations made in passing; (2) the district court took specific curative action; and (3) the size of the damage award suggests that counsel's comment had a prejudicial effect." *Ventura v. Kyle*, 825 F.3d 876, 885 (8th Cir. 2016) (cleaned up).  "The weight of the evidence is another relevant factor in determining whether the improper argument deprived a party of a fair trial." *Id*. (cleaned up).

Upon review of the factors, the Court does not find that the reference to amputation was "plainly unwarranted and clearly injurious" and "cause[d] prejudice to the opposing party and unfairly influence[d] a jury's verdict." *Harrison*, 312 F.3d at 351 (quoting *Alholm v. Am. Steamship Co.*, 144 F.3d 1172, 1181 (8th Cir. 1998)).  First, counsel's single reference to amputation was an "isolated comment[ ]" in the "context of an otherwise proper closing argument." *Lawrey*, 751 F.3d at 954 (citing *Anastasio v. Schering Corp.*, 838 F.2d 701, 706 (3d Cir. 1988)).  It was nothing like the "grossly inflammatory statements [ ] the Eighth Circuit has found warrants a new trial." *Estate of West v. Domina Law Grp., PC*, 2019 WL 10888714, at *19 (S.D. Iowa May 21, 2019); *see, e.g.*, *Ventura*, 825 F.3d at 886 (a single statement about insurance was highly prejudicial because "it is utterly repugnant to a fair trial or a just verdict for the jury to hear that the damages sued for will be taken care of by an insurance company" (cleaned up)); *Gilster*, 747 F.3d at 1011 (counsel's recounting of her own personal experience enduring sexual harassment was "a deliberate strategic choice to make emotionally-charged comments at the end of rebuttal closing argument, when they would have the greatest emotional impact on the jury, and when opposing counsel would have no opportunity to respond").

Second, although the Court did not take any "specific curative action" in response to Plaintiff's counsel improper remark,[4] it did instruct the jury at the beginning of trial that lawyers'

---

[4] No such action was requested.

14

statements, arguments, questions, and comments are not evidence.[5]  The Eighth Circuit has found that the Court's "'reminder that counsel's arguments are not evidence' [is] an insufficient curative instruction, particularly where the court overruled the defendant's contemporaneous objection." *Ventura*, 825 F.3d at 885 (quoting *Gilster*, 747 F.3d at 1011).  But Defendants did not object to Plaintiff's closing remarks.  *See Lange v. Schultz*, 627 F.2d 122, 127 (8th Cir. 1980) ("[C]ounsel must either make an objection or take an exception or move for a mistrial at the time of the alleged misconduct, or where it involves a closing argument, counsel may, and preferably should, make his objection, take his exception, or ask for remedial action at the close thereof and before the case is submitted to the jury."); *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 239 (1940) (during closing argument, counsel "cannot as a rule remain silent, interpose no objections, and after a verdict has been returned seize for the first time on the point that the comments to the jury were improper and prejudicial").  Where, as here, there was no objection, the Eighth Circuit has found that the Court's admonition to the jury that statements of attorneys are not evidence remedied any prejudice from improper remarks in closing argument.  *See United States v. Eagle*, 515 F.3d 794, 806 (8th Cir. 2008) (finding under plain error review that "the district court's instruction to the jury that closing arguments are not evidence alleviated any harm caused by the government's remarks"); *Billingsley v. City of Omaha*, 277 F.3d 990, 997 (8th Cir. 2002) (where plaintiff failed to object at trial, district court's admonition, both at the beginning of trial and prior to closing arguments, that statements made by the attorneys are not evidence remedied any prejudice); *Jones v. Nat'l Am. Univ.*, 608 F.3d 1039, 1048–49 (8th Cir. 2010) (finding under plain error review that plaintiff failed to "demonstrate that this is an 'extraordinary situation' involving a 'plain miscarriage of justice,' . . . especially [ ] given the district court's admonition to the jury prior to closing arguments that statements made by the attorneys are not evidence").

And third, the magnitude of the award—though considerable—does not suggest that counsel's single improper comment had a prejudicial effect.  Because Plaintiff was not making a claim for lost wages or medical expenses, Plaintiff's counsel spent much of the trial eliciting

---

[5] Neither party requested that the Court deliver such an instruction at the end of the trial—even after Plaintiff's counsel violated the Court's order with respect to Ms. Waddy's testimony.  *See* Docs. [50] (Plaintiff's proposed jury instructions); [42] (Defendants' proposed jury instructions); *see also* [74] (final jury instructions to which neither party objected).

15

testimony about the pain and suffering Plaintiff has experienced, and will continue to experience, because of her injury. Then, in his closing argument, Plaintiff's counsel leaned heavily on the long-term effects on Plaintiff's quality-of-life in arguing for damages of $3,100,038.46:

> Three questions I want you to ask.
>
> One, how much is the harm? Two, how long did it, how long will it last? Three, how has it and will it impact Rosemarie's life?
>
> And I've got to go a little fast here -- I'm sorry, folks -- but I know you heard this evidence. How much is the harm? One, you saw her broken leg. You saw Dr. Miller talk about it. You saw Dr. Miller talk about the surgery that had to be performed to fix her leg, what it looked like afterward. You heard Rosemarie talk about the immense pain that she was in, how she could feel the screws in her bone coming loose, how she still to this day feels the screw that was broken that had to be left in there, how in weather like we've experienced today and yesterday, how it's so incredibly painful. You heard Cliff, her husband, talk about how some mornings she'll just wake up in excruciating pain, and then the day is shot.
>
> You heard that she went through three surgeries. You heard Dr. Miller talk about what she had to do in that last one, the debridement, where she had to go in with a tool and scrape out the infected bone with an ice cream scoop that had edges on it **because Mrs. Waddy was this close to needing an amputation of her foot.**
>
> In my mind I broke this up into sort of two phases. First, from the day of the injury until she had that third surgery, that's when -- she did have another injection after it, but that's when the major -- that's when basically the rest of her life began, after she had that third surgery; okay? And so that's section one, phase one, so to speak. Phase two, from that day forward. So how has it, how will it impact her life? As a woman, as a mother, as a grandmother. You heard her talk about I can't wear high heels anymore. I can't wear boots. I don't go on dates with my husband as much. I can't go hiking. Swimming was one of my great loves. I used to swim miles. I had a group, 5 a.m. she would get up and go swim with her ladies. She doesn't do that.
>
> . . .
>
> You saw these photographs. You heard her talk about her family, what she loved to do, and so I would suggest to you, members of the jury, that her damages for that first phase, for that 54 weeks, okay, from that first phase, I would suggest to you, folks, you can decide on the number. You can go up; you can go down. **My suggestion to you is for that 54 weeks, for the immense pain that she went through, the burning pain, $311,538 -- 538.46 for those 54 weeks**. You get to decide more likely than not.
>
> And then for the future, we showed you the National Vital Statistics report that said 26.9 years. So from that second phase, February 7, 2020, forward to the point where we are today and the next 26.9 years, that's 49 months post-surgery and then another 322.8 months into the future under her life expectancy. **I**

16

> **suggest to you the evidence warrants a verdict of $2,788,500 for that point in time because this is a verdict for all time,** and the total damages that you should enter on the verdict form for Mrs. Waddy, $3,100,038.46.  That is the number that you should put in there.  That is the number that balances what Highland Ventures has taken from her.

Doc. [81] at 17-18 (emphasis added).

Considered in context, the remark to which Defendants now object—i.e., that Ms. Waddy's injury imperiled her entire foot—played a minor role in Plaintiff's damages argument.  Plaintiff's counsel did improperly use it to emphasize the severity of Plaintiff's injury, but it was far from the only evidence cited for that purpose.  The vivid descriptions of the hardware in her leg and the number and character of her surgical procedures also amply conveyed that point.  Even if it had played an outsized role in the jury's assessment of the injury's severity, though, Plaintiff's counsel argued that his client should receive only approximately $300,000 for the year in which she suffered through the injury and treatment.  The other 90 percent of Plaintiff's damages request was based on putative long-term effects on Plaintiff's quality-of-life, which have nothing to do with the precarity of her condition *before* her final surgery.  The fact that the jury's assessment of Plaintiff's damages was more than six times what she requested based on the immediate burdens of her injury and treatment suggests that a single remark going to the seriousness of her physical condition before her treatment was complete played only a minor role in it.

In his own closing argument, Defendants' counsel spent little time on damages.  He argued that "whatever problems [Plaintiff's] having haven't been serious enough to get her to go back [to Dr. Miller]," Doc. [81] at 39, and then directed the jury's attention to Dr. Miller's testimony that she had never placed any physical restrictions or limitations on Plaintiff.  He concluded by "respectfully suggest[ing] . . . that," if they allocated any fault to his client, "damages are less than $100,000."  *See id*. at 39-40.

Considering all of the evidence presented at trial, together with the fact that counsel's improper remark was a small part of Plaintiff's argument for a small portion of Plaintiff's overall damages, the size of the jury's award does not suggest that the improper remark had a prejudicial effect.

Finally, the weight of the evidence also counters Defendants' argument that a single improper remark deprived them of a fair trial.  The remark was a minor component of Plaintiff's

17

closing argument for damages. Its significance is eclipsed by the rest of the trial record. Having seen and heard all the evidence, the Court finds that it was reasonable for the jury to credit Plaintiff's account of her injury and of the pain and suffering it has caused her.

This is not the "rare case" where the party has "made a sufficient showing of prejudice caused by 'plainly unwarranted and clearly injurious' closing argument." *Gilster*, 747 F.3d at 1008 (quoting *Morrissey*, 821 F.2d at 1303). Defendants' motion for a new trial or remittitur is denied.

Accordingly,

**IT IS HEREBY ORDERED** that Defendants' Motion for Judgment as a Matter of Law, Doc. [83], and Motion for New Trial or Remittitur, Doc. [84], are **DENIED**.

**IT IS FURTHER ORDERED** that Defendants' Motion for a Hearing, Doc. [96], is **DENIED as moot.**

**IT IS FINALLY ORDERED** that Plaintiff's Motion for Leave to File Sur-Reply, Doc. [97], is **DENIED as moot.**

Dated this 25th day of March, 2025.

_____
SARAH E. PITLYK
UNITED STATES DISTRICT JUDGE